

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL GAGLIARDI,                                )   CIVIL ACTION NO.
Individually and in his capacity as a             )
Member of the MERRIMACK VALLEY                    )
WORKFORCE INVESTMENT BOARD,                       )
        Plaintiff                                 )
                                                  )
                                                  )
vs.                                               )
                                                  )
MICHAEL J. SULLIVAN,                              )
THE CITY OF LAWRENCE,                             )   MAGISTRATE JUDGE
MITT ROMNEY, as the Governor of the               )
COMMONWEALTH OF MASSACHUSETTS,                    )
RANCH C. KIMBALL, as Secretary of the EXECUTIVE   )
OFFICE OF ECONOMIC DEVELOPMENT,                   )
SUSAN V. LAWLER, individually and as              )
Commissioner of the MASSACHUSETTS and             )
DIVISION OF CAREER SERVICES,                      )
                                                  )

## COMPLAINT

This is a civil rights action arising out of the Mayor of Lawrence's termination of

an independent regional board known as the Merrimack Valley Workforce Investment

Board ("the Board"). The Mayor fired the Board in retaliation for decisions on matters of

public concern, which were properly before the Board. The members were fired for

overseeing a city department, as they were required to do by federal law, and for refusing

to cede their statutory authority to the Mayor.

The Mayor's goal was to maintain control over $7 million per year in regional

workforce funds. The Board's exercise of its oversight responsibilities had threatened that

control. The Board's exercise of its statutory role also threatened a state agency known as

the Division of Career Services ("DCS"). The Board oversees DCS when that agency acts

as a partner with the City. However, DCS is also is the state agency charged with

certifying the Board. DCS cannot decertify the board without due process, but it
conspired with the Mayor to do just that.

Before DCS intervened, the Board's relationship with the Mayor was
memorialized in a contract that complied with federal law. Neither the agreement, nor
any statute, gave the Mayor authority to remove members of the Board, even for cause.
But with DCS's support, the Mayor claimed the right to fire Board members and staff at
will, among other concessions. When the Board did not accept these demands, the Mayor
simply declared it was dissolved. He never explained what authority he had to fire the
Board, other than saying state officials told him to do it.

The members, who were appointed for a term of three years, have a property
interest in their positions. They were terminated without cause and without due process,
in violation of their First Amendment rights. The Plaintiff, Michael Gagliardi, seeks
declaratory relief and damages under 42 U.S.C. § 1983.

## INTRODUCTION

1. On November 18, 2005, Mayor Michael Sullivan ("the Mayor") announced he
   had dissolved the Merrimack Valley Workforce Investment Board ("the
   Board") at the direction of state officials. For months, Sullivan had planned to
   make this the first order of business after the Lawrence mayoral election.

2. A department of the City of Lawrence ("the City") administered $7 million in
   workforce funds under the Mayor's supervision. The Board had a statutory
   responsibility to oversee these expenditures to make sure these funds were
   used according to policies the Board developed for the benefit of the entire
   region.

3. In the months before the election, the Board had deliberated at public meetings concerning problems the Mayor found embarrassing. The City was holding and spending $1.1 million in regional training funds without the Board's knowledge or approval. In the exercise of its oversight responsibility, the Board ordered an audit of all workforce funds.

4. A department of the City, under the Mayor's control, ran career centers in Lawrence and Haverhill in partnership with DCS. The Board issued a report critical of the way the city and state agencies were running those career centers. It considered hiring a new entity to operate the career centers.

5. In order to protect their franchise, the Mayor and DCS conspired to destroy the Board by interfering with its routine certification process. The Mayor first delayed certification by failing to take certain required actions. Then, he purported to delegate to his own attorney the Board's function of submitting its certification documents.

6. There was no legal basis for the Mayor to delegate the Board's authority, yet DCS colluded with the Mayor, stating that it would deal only with his representative.

7. Rather than using the certification package which the Board had already submitted with the Mayor's approval--and which DCS had conditionally accepted--the Mayor now directed his attorney to draft an agreement that completely changed his relationship with the Board. The agreement made the Board subordinate to the Mayor, allowing him to fire its members and its paid

staff on a whim. Such provisions are inconsistent with federal law, and there was no legal basis for requiring the Board to accept them.

8.  When Board did not approve these drastic and improper changes, the Mayor did not submit previous agreement, which he, the Board and DCS all found acceptable. Instead, he met in secret with state officials. Then the Mayor announced the Board was fired. There was no legal basis for the Mayor to terminate the Board, with or without cause.

9.  DCS did not claim to decertify the Board, but it could not have done so without statutory due process, which was clearly absent in this case.

10. The Mayor has now purported to appoint a new Board, composed largely of City vendors, political allies, and members of the Mayor's staff. There was no legal basis for the Mayor to appoint any Board without the approval and participation of all the other chief elected officials in the region. And there was no legal basis for the appointment of any board where the existing Board had not been lawfully dissolved.

11. The new board's first order of business was to approve an agreement the Mayor's attorney and DCS had drafted together. This agreement contained the very provisions the previous Board rejected. The board's new subordinate status denies it the power to properly oversee the Mayor's use of regional workforce funds and is inconsistent with federal law. Further, the Mayor's decisions are not subject to public scrutiny under the open meeting law.

## JURISDICTION

12. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

## PARTIES

13. Michael Gagliardi is a natural person residing in Westford, Middlesex County, Massachusetts and a director of the Board. At times material to the Complaint, he served as a member of the Board's Fiscal Accountability Task Force.

14. Michael J. Sullivan ("the Mayor") is a natural person residing in Lawrence, Essex County, Massachusetts and is employed as mayor of the City of Lawrence, Essex County, Massachusetts.

15. The City of Lawrence is a municipal corporation and a political subdivision of the Commonwealth of Massachusetts.

16. Mitt Romney ("the Governor") is the Governor of the Commonwealth of Massachusetts, with a usual place of business at the Massachusetts State House, Room 360, Boston, Suffolk County, Massachusetts.

17. Ranch C. Kimball is the Secretary of the Executive Office of Economic Development of the Commonwealth of Massachusetts, with a usual place of business at One Ashburton Place, Room 2101, Boston, Suffolk County, Massachusetts.

18. Susan V. Lawler is the Commissioner of the Division of Career Services ("DCS"), a division of Massachusetts Department of Workforce Development ("DWD"), a department of the Commonwealth of Massachusetts, with a usual place of business at the Hurley Building, Staniford Street, Boston, Suffolk County, Massachusetts. Kimball ultimately oversees Lawler and her division.

19. Ed Anderson, Robert Ansin, Pedro Arce, Joseph J. Bevilacqua, Shirley Callan, Sheila Casey, Benigno Espaillat, Joseph Faro, Mark Forman, Donna Gambon,

Eileen Giordano, Gary Hale, William J. Haley, Robert Halpin, David Hartleb,

Joan Hull, Wilfredo Laboy, Mike Lech, Jeff Linehan, Charles Lopiano, Sal

Lupoli, Ellen Murphy-Meehan, Maria Miles, George Noel, Sally Cerasuolo

O'Rorke, Daniel Ouellette, Juan Pascual, William Piercey, Don S. Roussinos,

Thomas Schiavone, Fred Shaheen, Chester F. Sidell, Dianne M. Tarpy, Laura

Walta, Calvin C. Williams, and Leonard A. Wilson are members of the

Merrimack Valley Workforce Investment Board and pursuant to F.R.Civ.P 19

( c ) are not named as parties because it cannot be determined at the time of

the filing of this complaint whether each of the individuals would consent to

join this lawsuit as voluntary plaintiffs or whether they should be made

involuntary plaintiffs. Pursuant to F.R.Civ.P. (ADVISORY COMMITTEE

NOTES – Paragraph 2 ) these individuals are "cited" both individually and as

a group for purposes of Plaintiff's request for declaratory relief in Count I of

this complaint.

## FACTS

### The Importance of an Independent Board

20. The Merrimack Valley Workforce Investment Board, Inc. ("the Board") is a

nonprofit Massachusetts corporation with a usual place of business at 60

Island Street, Lawrence, Massachusetts. It represents fifteen communities

including Lawrence, Haverhill, Methuen, Andover, Salisbury, Amesbury, and

Newburyport.

21. The Board is one of sixteen workforce investment boards established throughout Massachusetts pursuant to the federal Workforce Investment Act ("WIA" or the "Act"), 29 U.S.C. §§ 2801-2945.

22. The Board's fundamental responsibilities are to: (a) establish workforce development policy for the region; (b) set a budget for the expenditure of federal and state funds; and (c) oversee the operation of one-stop career centers in Lawrence and Haverhill. 29 U.S.C. § 2832(d).

23. The Board was at all times material to the Complaint made up of thirty-seven members, who were appointed to serve a three-year term as directors of the corporation. ( By-laws, attached as Exhibit A at ¶ 2.3.)

24. The directors were appointed pursuant to criteria in WIA. They included community, educational, business, and labor leaders, who were chosen for their knowledge and expertise and were expected to exercise independent judgment regarding how an annual budget of approximately $7 million in federal, state, and local funds was spent to provide training for workers in the region. 29 U.S.C. § 2832.

25. By statute, the majority of the Board had to be representatives of business, particularly those with "optimum policymaking ... authority." Id.

26. WIA does not intend that the mayor of one city control the workforce training funds for an entire region. The statutory safeguard against such a concentration of power in one municipality is a WIB that represents the interests of the other communities in the region.

27. The Mayor purports to act as the Board's Chief Elected Official ("CEO"). Under the Act, the CEO is chosen by agreement with the chief officials of all the cities and towns in the region. 29 U.S.C. § 2801(6). Such an agreement specifies the respective roles of the individual elected officials in appointing board members and carrying out their other responsibilities. 29 USC 2832(c)(1)(B).

28. On information and belief, there is no agreement signed by representatives of the region's fifteen cities and towns appointing Michael J. Sullivan Chief Elected Official or defining his responsibilities in relation to those of other elected officials in the region. In the absence of such an agreement, the Mayor is without authority to act as CEO.

29. On information and belief, a prior mayor of Lawrence once signed an agreement with elected officials of some of the region's municipalities. That agreement has expired and the Mayor has not sought or obtained a new agreement.

30. WIA does not give the CEO the power to remove Board members, even for cause. According to the Bylaws (which the Mayor approved), only the Board has the authority to remove members for cause. (By-laws at 2.2, 2.5, 2.7. – at Exhibit A )

31. Neither WIA, nor the By-laws, nor any agreement between the Board and the Mayor, permit a Board member to be terminated without cause prior to the expiration of his term.

32. The Board is not required to carry out the Mayor's policies or submit to his judgment, nor is the Mayor empowered to act in place of the Board.

The Partnership between the Mayor and the Board

33. WIA requires that the CEO and the Board are equal partners in certain aspects of the workforce system. *See, e.g.,* 29 U.S.C. § 2832(d); 29 U.S.C. § 2833(a).

34. State policy is consistent with the Act in requiring "a strong, cooperative partnership" between the CEO and the WIB. (State Policy 04-67, attached as Exhibit B at p. 7.) "By enabling the LWIB and the CEO to act effectively as independent agents, their partnership will be strengthened and their joint impact will be significant." Id.

35. Purporting to be the CEO, the Mayor entered into an agreement with the Board defining their roles as partners. (WIB-CEO Agreement, attached as Exhibit C.)

36. Important aspects of the WIB-CEO Agreement include the following:

   a. There is no provision granting the Mayor any right to remove a Board member, with or without cause;

   b. No specific career center operator is designated, as WIA provides that the Board and CEO act in partnership to choose and/or replace the operator (*Compare* WIB-CEO Agreement at III.C.4. *with* 29 U.S.C. § 2832(d)(2) and 29 U.S.C. § 2841(d));

   c. The Board is responsible for developing a budget for the region's workforce development system Id. at III.C.8.);

   d. The Board's staff report to the Board's executive director; (Id. at IV.B.);

   e. The Board participates in choosing senior level staff at the career centers (Id. at IV.B.); and

   f. Disputes between the Mayor and the Board are to be resolved via binding arbitration (Id. at V.B).

37. Because Board members are supposed to be appointed pursuant to an agreement with officials from the other municipalities, an independent Board prevents the concentration of power in one city. Further, the Board is subject to the Massachusetts Open Meeting Law, which guarantees that the decisions regarding regional policy and funds are subject to public scrutiny. (29 U.S.C. § 2832(e); WIB-CEO Agreement at III.C.15. at Exhibit C.)

### The Conflict of Interest at DCS

38. Under WIA, the Governor is required to recertify all WIBs in the Commonwealth every two years. 29 U.S.C. 2832(c).

39. The Governor apparently delegated the task of recertification to DCS. The purpose of recertification is to assure that each local WIB's membership continues to meet the criteria of WIA, including important policymaking officials from the region, and to make sure that the Board is meeting its own goals. Id.

40. Recertification is usually a routine process based on a board's submission of certain documents. Interestingly, one document DCS does not require is an agreement designating a Chief Elected Official and defining his powers and responsibilities in relationship to the heads of the other cities and towns in the region. (State Policy 04-67 at p. 17. at Exhibit B.)

41. DCS has no standards whatsoever that determine whether a certification package must be approved or rejected. Therefore, DCS believes that it can act arbitrarily to threaten a board's certification in order to protect its own interests.

42. DCS is a partner in operating career centers in each region, which provide training and other services to job seekers. The career centers are the main mechanism through which the local boards do their work. Under WIA, the local boards are required to set the budgets for the career centers, create policy they must follow, and oversee and evaluate what they do. 29 U.S.C. § 2832(d).

43. In the Merrimack Valley, a City department known as the Division of Training and Development ("DTD") works in partnership with DCS in operating the career centers.

44. While DCS is subject to oversight by local boards, DCS has retaliated when a local board demanded improvement or sought to change the local operator.

45. On information and belief DCS sought to exert control over the operations of the one-stop career center in New Bedford.

46. On information and belief, DCS also interfered when the Brockton WIB sought to change the one-stop career center operator. DCS threatened to move the career center to another region.

47. DCS officials also have a personal interest in protecting DTD and its management.

48. Arthur Chilingirian, the executive director of DTD, was employed in the state bureaucracy and has longstanding relationships with DCS and DWD employees.

49. A top DCS policy analyst, Barbara Zeimetz, was one of two people who interviewed and recommended Chilingirian to be the executive director of

DTD. Zeimetz is a friend of Chilingirian, and reports directly to Lawler.

Zeimetz and Lawler have been intimately involved in the actions of DCS that

are the subject of this Complaint.

## The Board Acts Within Its Authority

50. Due to concerns regarding the way the City and DTD, with the support of

DCS, were handling regional funds, the Board created a Fiscal Accountability

Task Force ("the Task Force"). Gagliardi was appointed to serve on that Task

Force.

51. The Board discovered a secret fund containing over $1.1 million in

unexpended grant monies, which the Mayor and DTD were using without the

Board's knowledge or approval.

52. Jane Edmonds, the director of DWD, took the position that such funds are

common and legal. She saw nothing wrong with one mayor's use of regional

workforce funds for his own undisclosed purposes, without any standards or

oversight.

53. It was necessary to file a request under the Freedom of Information Act to find

out how much was in the fund and how it was being used. (FOIA Request,

attached as Exhibit D.)

54. The City never provided a complete response to that request. The Mayor's

agents said the Board's staff members should be fired for disclosing the

existence of the fund.

55. The Board's staff had produced an in-depth report showing that DTD and DCS: (a) did an inadequate job of providing certain services; (b) missed important opportunities; and (c) and fell short of the goals the Board had set.

56. In response to these concerns, the Board did two things that the Mayor found unacceptable. First, the Task Force recommended a complete audit of all workforce funds, including the Mayor's $1.1 million "discretionary" fund. Second, the Board began to discuss whether DTD should be replaced as the career center operator.

### Using the Certification Process to Destroy the Board

57. The Board had been certified in 2000 and again in 2002. It submitted essentially the same certification package in 2004 as it had on the two prior occasions. This time however, the package was not accepted.

58. DTD had been serving as the employer of record of the WIB's staff and had been using that position to exert control over the Board. For example, DTD refused to pay raises to which the staff members were entitled.

59. The Board pointed out that state policy forbade DTD to serve both as the career center operator and the employer of record of the WIB staff.

60. Although DCS had not enforced that policy with other WIBs, on information and belief, it now agreed that the fiscal agent had to change.

61. DCS found no fault with the usual documents, including the WIB-CEO Agreement, but stated that it would not fully certify the Board until the Mayor had actually completed the transition of the Title I administrator and staff employer functions.

62. Only the CEO could make this change, and the Mayor failed to do it. Throughout 2005, the Mayor, through his inaction, prevented the certification process from being completed.

63. In 2005, the Board also urged the Mayor to take certain fiscal responsibilities away from DTD. Board members believed it was a conflict of interest for DTD to act as the Board's fiscal agent and Title I administrator, controlling the very funds DTD was using.

64. The Mayor signed a new WIB-CEO Agreement stating that these fiscal responsibilities had moved to another City department. This representation was false. Again, the Mayor did not accomplish what he had committed to do, and DCS seized upon this failure as another reason to hold up the full certification of the WIB.

65. The City admitted that, at least as of September 2005, the Board had "compiled all of the documentation in its purview" necessary for certification and "there are a few items that remain which are dependent on City of Lawrence decisions." (Letter, September 22, 2005, attached as Exhibit E.) These items were the transition of DTD's functions as the staff's employer and as the Board's Title I administrator and fiscal agent.

66. After several requests that the Mayor take the required steps, the Board's chairman and plaintiff Gagliardi disclosed the Mayor's inaction to the local newspaper.[1] Their comments appeared in an article dated September 13, 2005. (Tribune Story, attached as Exhibit F.)

---

[1] Although the chairman threatened to resign, he did not tender his resignation and continued to serve until the Mayor purported to disband the Board.

67. Kevin Sullivan, the Mayor's brother and a key advisor, was furious that Board members would speak out during an election year. He declared that he had influence with the state and could cause the Board to be decertified "in ten minutes." He added, "The Board needs to be decertified at the beginning of the year."

68. This was not an empty threat. Sullivan is a former cabinet secretary to two Republican governors and claims to have great influence with the Romney administration. Sullivan may well have had the power to cause Romney, Kimball, Lawler and other state officials to support his brother's unlawful dismissal of the Board.

69. The Governor has ultimate responsibility for the certification of the Board. A WIB can be decertified only for certain specific acts or omissions and is entitled to due process, including rights of appeal. 29 U.S.C. § 2934 (b).

70. In the fall of 2005, the Mayor told Lawler that he would seek to disband the Board immediately after the November election. (Mayor Letter, October 5, 2005, attached as Exhibit G.)

71. Meanwhile, DCS used the Board's "conditional" status to control what the Board could discuss at public meetings. DCS staff privately said they wanted to prevent the Board from evaluating the operation of the career centers. Lawler directed the Board not to discuss anything except issues relating to certification. (Lawler Letter, October 21, 2005, attached as Exhibit H.) DCS has no authority to control what an independent board discusses at public meetings.

72. At least a year earlier, in an effort to control the WIB, the Mayor had chosen Attorney William DiAdamo ("DiAdamo") to represent the Board. DiAdamo and his father and law partner, Attorney Carmine DiAdamo ("Carmine") are close advisors of the Mayor.

73. DiAdamo failed to carry out important assignments, and his contract was not renewed. He then announced that he represented the Mayor and not the Board.

74. DiAdamo directed the Board not to audit the City's use of workforce funds, as the Fiscal Accountability Task Force had recommended. He threatened that if the Board voted to perform an audit, its members could be personally liable for the costs.

75. The Mayor purported to appoint DiAdamo to be the region's representative in dealing with DTD with regard to all WIB certification issues. (Mayor Letter, October 5, 2005, attached as Exhibit I.)

76. Lawler eagerly endorsed the plan to cut the Board out of the certification process. She wrote, "[W]e will only accept further submissions of requested documents and information related to outstanding compliance issues from Attorney DiAdamo as requested by the Chief Elected Official for the area." (Lawler Letter, October 21, 2005, at p. 2. – at Exhibit H.)

77. The Mayor had no authority to delegate the Board's responsibility to DiAdamo, and DCS had no authority to refuse to deal with the Board.

78. The Board, wishing to complete its certification submission, asked DiAdamo what documents still needed to be submitted. DiAdamo did not answer the

Board's question. Instead, he stated that he would submit an entire new certification package.

79. DiAdamo had no authority to rewrite documents the Board and Mayor had approved and submitted and DCS had conditionally accepted. He performed this action in bad faith, with the collusion of DCS, and with the purpose of changing the power relationship between the Mayor and the Board in a manner that was inconsistent with the statutory requirement of an equal partnership.

80. The Mayor had set up a meeting with DCS, to take place after the election, at which DiAdamo would present the final certification documents. The day before the meeting, DiAdamo and his father met with the Board's chairman and ordered him to approve the new documents the Mayor proposed to submit.

81. When he represented the Board, DiAdamo had drafted By-laws and a WIB-CEO Agreement. These were the documents the Mayor had approved and DCS had conditionally accepted. Now, acting adversely to the interest of his former client, DiAdamo drafted new By-laws and a new WIB-CEO Agreement. These documents destroyed the ability of the Board to act as an equal partner with the Mayor by providing that the Mayor could terminate the Board and its staff without cause, among other concessions.

82. When the chairman indicated this demand was inconsistent with the federal Workforce Investment Act, Carmine DiAdamo shouted, "I don't give a s__t

about workforce development! The package that goes in has got to include
that!"

83. DiAdamo said this provision was necessary to prevent the Board from
replacing DTD as the career center operator. He said new Board members
would have to agree to keep DTD in place.

84. Carmine DiAdamo said he had powerful allies in defendant Ranch Kimball's
office, who would decertify the Board on a moment's notice. He threatened
that if the chairman did not accept the changes the Mayor wanted, Kimball
and his subordinates would cause the Board to be decertified.

85. The parties spent several hours negotiating the terms of the new documents
DiAdamo had prepared, but the chairman would not agree that the Mayor
could fire Board and staff members at will.

86. The chairman came to the Mayor's office the following morning to attend the
meeting with DCS. He was told that the meeting had been moved and he was
not invited. He waited for approximately two hours.

87. Meanwhile, the Mayor and his advisors met at a secret location with four DCS
and/or DWD officials. At the end of the meeting, the Mayor announced that
he had disbanded the Board.

88. The Mayor and DCS took the position that the Board had to be dissolved
because it had not submitted a complete certification package. The Mayor and
DCS both knew, however, that they had prevented the Board from submitting
a certification package by purporting to delegate that authority to the
DiAdamo.

89. The Mayor also said the Board had to be dissolved because conflicts among its members prevented it from operating effectively. This was completely untrue. The Board was functioning well. Its dispute was with the Mayor.

90. Later, Lawler took the position that the Board had to be disbanded because its members had not voted on the certification package DiAdamo proposed to submit. DCS had not required a vote on the previous two certification packages, and, on information and belief, has never required such a vote from any WIB in the state. DCS had no authority to require such a vote and no basis to treat the Board differently from any other WIB.

## The Rubber Stamp Board

91. Conspicuously missing from the certification package, on information and belief, was any suggestion of a process by which the region's other elected officials could participate in appointing a new board. DiAdamo merely said he had spoken with chambers of commerce. Chambers of commerce have no authority to appoint WIB members.

92. On information and belief, the Mayor rejected other Mayors' requests for the appointment of board members, such as the Methuen Director of Economic Development.

93. Whatever process he used, the Mayor purported to appoint a new board on or about January 18, 2006 ("the Mayor's Board").

94. The Mayor's Board includes three City employees, one DCS representative, two coworkers of Kevin Sullivan, and various vendors of the City. It has fewer members than before from outside Lawrence.

95. It is extremely unusual for one business to have two members representing it on a WIB, as is the case with the Mayor's brother's business.

96. Previously, vendors were not permitted to serve on the Board. But now the mayor appointed a member with whom DTD had been ordered to do business, Jean Perrigo of Corporate Express. Pursuant to Policy 02-01, (attached as Exhibit J., DTD ) was required to use Corporate Express for all office supplies and furniture. DTD may use other vendors only when it has "exhausted all resources through Corporate Express."

97. The By-laws set a goal of diversity among the Board's membership. (By-laws at ¶ III.C.7.) Although 60 percent of the population of Lawrence is Latino, the Mayor chose only one Latino board member, Pedro Arce, a local politician who is one of the Mayor's supporters. The Latino press called Arce "a token," adding, "Mayor Sullivan must align himself with quality people, not just 'yes' people." ("The WIB: Another Black Eye for Lawrence," Rumbo, February 22, 2006, attached as Exhibit K.)

## Violations of the Open Meeting Law

98. The Mayor's Board has met at least twice, both times in violation of the Massachusetts Open Meeting Law. G.L. c. 39, § 23B.

99. The Mayor's Board met with DWD officials at the offices of DTD on February 14, 2006. The meeting was not posted and, on information and belief, no minutes were taken. The WIB staff were excluded, as were the newspapers and the public.

100.    The second meeting also took place at DTD's offices and was posted only
        in Lawrence, rather than throughout the region as required. At the meeting,
        the Mayor's Board was asked to approve documents drafted by DiAdamo and
        revised by DCS.

101.    The Essex County District Attorney had previously advised the WIB
        regarding the requirements of the Open Meeting Law. Because the WIB is a
        regional board, meetings must be posted in the municipal offices of each city
        and town in the region. (D.A. Letter, November 18, 2005, attached as Exhibit
        L., *quoting* G.L c. 29, § 23B.)

102.    DiAdamo had received a copy of the letter, but he and DCS chose to draft
        a new WIB-CEO Agreement that they knew violated state law. The document
        required only that meetings be posted in Lawrence. (Mayor's Agreement,
        attached as Exhibit N, at I.B.10.) This was part of the Mayor's pattern of
        excluding cities other than Lawrence from involvement in the regional
        workforce system and the expenditure of federal and state funds.

103.    A DWD attorney, Paul O'Neill took the unusual step of attending the
        meeting. O'Neill indicated that only he had the authority to interpret the Open
        Meeting Law. He directed the Board to disregard the legal opinion of the
        District Attorney and to deliberate. As attorneys, O'Neill and DiAdamo knew
        or should have known they were advising a public board to violate state law.

104.    The Mayor's Board unanimously approved everything O'Neill and
        DiAdamo put in front of its members: thirteen documents consisting of 45

pages of dense legal language. There was little or no discussion of the

documents. The meeting lasted 22 minutes.

105.    The Mayor's Agreement contains all the provisions the Board refused to

accept, resulting in its termination. The changes give the Mayor final authority

over the Board, its staff, and all the regional funds. DiAdamo's new version of

the agreement includes the following provisions:

   a. The Mayor may remove any Board member without cause, "effective
      immediately upon delivery of the written notice (Id.);"

   b. DTD and DCS are the career center operators, and the Board has no
      ability to select a different operator (Id. at I.A.10);

   c. The Board now shares its budgetary responsibilities with the City (Id.
      at III);

   d. The Board no longer has the right to binding arbitration to resolve
      disputes with the Mayor (Id. at IV.B);

   e. The Board no longer has any involvement in hiring senior level staff
      for the career centers; and

   f. The Mayor has final decision making authority with regard to hiring
      and firing the Board's staff (Id. at II).

106.    When the package was submitted, on information and belief, the Mayor

had still not done the work required to change the staff's employer of

record—the work DCS claimed prevented the Board from being certified.

With a new Board in place, and the Mayor firmly in control, DCS no longer

felt this was a problem.

107.    This action paves the way for the Mayor's attorney to submit a new

certification package. DWD has stated that it plans to act on the package by

March 15.

## COUNT I

### Declaratory Judgment

108.  An actual controversy exists concerning the authority of the Mayor to
terminate the Board.

109.  Plaintiff, seeks a declaration that:

a.    The Board members were all appointed for a term of three years;

b.    The Board members had a property right in their positions, which could
not be taken absent due process;

c.    The Mayor did not have the power to terminate the Board members;

d.    The Board members were not terminated for cause;

e.    The Board members were not afforded due process;

f.    The Board members were terminated in violation of their First
Amendment rights;

g.    The purported termination by the Mayor is a nullity, and without force and
effect;

h.    The WIB directors remain in their positions and are authorized to continue
conducting business, notwithstanding the purported termination;

i.    The purported appointment of new Board members is a nullity, and all
actions taken by such members are of no effect;

j.    The meetings of the new board violated the Open Meeting Law, and any
deliberations at those meetings are unlawful and of no effect; and

k.    The new By-laws and WIB-CEO Agreement adopted by the new board
are contrary to WIA and are of no effect.

## COUNT II

### First Amendment

110.    As members of a public board, the plaintiff is entitled to deliberate and to operate within their sphere of authority, free from unconstitutional restraint.

111.    The Board members were fired for performing an oversight function required by federal law.

112.    The Mayor's purported termination of the Board members, with the complicity of DCS, amounts to an unconstitutional interference with the right of free speech guaranteed by the First Amendment and Art. XVI of the Massachusetts Declaration of Rights.

## COUNT III

### 113.    42 U.S.C. 1983

114.    The Mayor did not act in good faith in attempting to discharge the Board members of the Board.

115.    DWD, acting in bad faith, enabled the Mayor to take such action either by cooperation or through threats or coercion.

116.    The Mayor acted by threats, intimidation and coercion to deprive the Plaintiff Gagliardi, as a Board member of his First Amendment rights.

## COUNT IV

### 117.    Injunctive Relief

118.    Plaintiff has a reasonable likelihood of success on the merits.

119.    Plaintiff seeks an injunction: (a) reinstating the Board; and (b) requiring the Mayor to submit and DWD to approve certification utilizing the original

By-laws and WIB-CEO Agreement; and (c) nullifying DCS's certification of

the new Workforce Investment Board and reinstating the Plaintiff and the

previous Board to its rightful position.

## RELIEF REQUESTED

Plaintiffs respectfully request the following relief:

1.   On Count I, a declaration that the termination of the Board was a nullity;

2.   On Count II, sufficient damages to compensate plaintiffs for the harm to

     their First Amendment rights;

3.   On Count III, punitive damages, costs, and attorney's fees;

4.   On Count IV, injunctive relief as requested, prohibiting the Mayor from

     interfering with the functioning of the Board, requiring the Mayor to assist

     the Board in completing the certification package, and nullifiying DCS's

     certification of the new Workforce Investment Board.

Respectfully submitted,

MICHAEL GAGLIARDI
By his attorney,

WALTER H. UNDERHILL, ESQ.
66 Long Wharf
Boston, MA
02110
Tel.# 617-523-5858
BBO# 506300

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.